1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLES LAWTON,                    Case No.   1:17-cv-00737-DAD-JDP

12              Petitioner,             FINDINGS AND RECOMMENDATIONS TO
                                        DENY PETITION FOR WRIT OF HABEAS
13        v.                            CORPUS AND DECLINE TO GRANT A
                                        CERTIFICATE OF APPEALABILTY
14   WILLIAM MUNIZ, Warden,
                                        OBJECTIONS DUE IN THIRTY DAYS
15              Respondent.
                                        ECF No. 9
16
                                        ORDER DENYING PETITIONER'S MOTION
17                                      FOR AN EVIDENTIARY HEARING

18                                      ECF No. 9

19

20        Petitioner Charles Lawton, a state prisoner proceeding without counsel, seeks a writ of

21   habeas corpus under 28 U.S.C. § 2254.  ECF No. 9.  Petitioner claims that his due process rights

22   were violated when: (1) the trial court failed to bifurcate gang enhancement proceedings from the

23   remainder of his criminal trial; (2) police officers used an unduly suggestive identification

24   procedure; and (3) the trial court refused to excuse a biased juror.  *See id.* at 4-5.  For the reasons

25   below, we recommend that the court deny the petition.

26

27

28

                                        1

1   **I.      Background**

2          In 2013, a jury sitting in Kern County convicted petitioner of thirteen criminal charges,

3   including robbery, attempted robbery, assault with a firearm, and active participation in the West

4   Side Crips criminal street gang.  He was sentenced to more than 70 years in state prison, a

5   sentence that accounted for numerous gang and firearm enhancements.[1]  *People v. Langston*, No.

6   F067421, 2016 Cal. App. Unpub. LEXIS 3712, at *1 (Cal. Ct. App. May 17, 2016).  We set forth

7   below the facts of the underlying offenses, as stated by the California Court of Appeal.  A

8   presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v.*

9   *Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

10               **The evidence at trial**

11               **Gold Buyers, Bakersfield, September 30, 2011**

12          Jacqueline Carrillo, 19 years old, testified that she was the manager
          of Gold Buyers at 4040 Ming Avenue in Bakersfield, a business
13          that paid customers cash for gold jewelry.  Around 2:00 in the
          afternoon on September 30, 2011, Carrillo was the only employee
14          in the store.  An African-American man, about six feet tall,
          appeared at the glass door and rang the doorbell.  Carrillo buzzed
15          him in.  She testified that he was in his late 20s and wore
          sunglasses, a black newsboy cap, and a long-sleeve, button-down
16          burgundy shirt.  A second man, also African-American, appeared
          and entered with him.  He was younger and shorter, about 19 or 20,
17          around five feet two or three inches tall (thus shorter than Carrillo,
          who was five feet four inches tall), and around 150 pounds.  The
18          short man was wearing a dark plaid, short-sleeve, button-down shirt
          with jean shorts.  He was also wearing a black baseball cap with a
19          sports team logo.

20          The short man was holding a black handgun.  He jumped over the
          counter and knocked Carrillo down.  He pinned her to the floor on
21          her stomach, held her by the hair and put the gun to her head.  He
          said, "Tell me where the money is, bitch?  I'm going to fucking kill
22          you."  As he looked for money, he dragged her along the floor by
          her hair.  The tall man stood behind the counter, telling the short
23          man where to look for money.  Then the short man grabbed

24   ───────────────

25   [1] Petitioner's co-defendant, Dupree Langston, was convicted of similar crimes and sentenced to a
    prison term exceeding 70 years.  Petitioner and Langston's direct appeals were considered
26   together.  Langston unsuccessfully sought habeas relief from this court, challenging the trial
    court's failure to bifurcate, suggestive identification procedures, and improper admission of
27   expert testimony.  *See Langston v. Sherman*, No. 1:17-cv-01108-DAD-SAB (E.D. Cal. Mar. 12,
    2019).  Because plaintiff's claims overlap with some of Langston's, we will refer to the findings
28   and recommendations in Langston's case, as appropriate, here.  *Id*.  ECF No. 19.

2

1      Carrillo's arm and told her to get up.  The robbers demanded to
       know where the safe was and said they would shoot her if she did
2      not show them.  She showed them the safe and opened it.  It
       contained about $10,000 and some gold items.  The short man took
3      this property.

4      During the robbery, the tall man gave orders to the short man.  The
       tall robber's voice was neutral, but the short one spoke loudly and
5      was the more nervous of the two.  After they took the money, they
       told Carrillo to buzz them out.  The tall man was holding Carrillo's
6      purse and the short one had taken her cell phone.  Carrillo said she
       would not buzz them out unless they gave her things back to her.
7      After taking the battery out of the phone, they complied and she
       buzzed them out.
8
       Carrillo and Sergeant Brent Stratton testified about photo lineups
9      Carrillo viewed on October 4, 2011.  While investigating a suspect
       ultimately not charged in the case, Stratton created a photo lineup
10     not including Lawton or Langston.  Carrillo made no selection.
       Carrillo and Detective James Dossey testified that Dossey showed
11     Carrillo two photo lineups on November 8, 2011.  One included
       Langston and the other included Lawton.  Carrillo identified
12     Langston as the short robber.  She did not select anyone in the
       lineup that included Lawton.
13
       Carrillo testified that, in January 2012, she met a police officer at
14     the courthouse and was asked to look through a window in a
       courtroom door.  This was on the day of the preliminary hearing.
15     Three African-American men were inside the courtroom sitting at a
       table.  The officer asked Carrillo whether the robbers were among
16     the men.  Carrillo could not see the men well enough to identify any
       of them.  She said they were too far away.  She picked out one man,
17     however, and said he definitely was not one of the robbers.
       Sergeant Stratton testified that the three men in the courtroom at
18     that time were Lawton, Langston, and Harper.  Harper was the one
       Carrillo singled out as not having been involved.
19
       During trial, after Carrillo described her recollection of the robbers'
20     appearance as "very vague," the prosecutor asked her whether
       anyone in the courtroom looked like the perpetrators.  Carrillo said
21     Langston looked like the short robber, based on his height and the
       lower part of his face.  "He had the hat on which was kind of low;
22     so I could just make out more so the bottom part of his face," she
       said.  Carrillo then testified that Lawton looked like the other
23     robber.  She relied on height and the lower part of the face in
       Lawton's case as well.  "Since he had a hat and glasses on, it's
24     really hard for me to make out the eyes," she testified.  When
       Lawton and Langston stood together, the difference in height
25     looked the same as the difference in height between the robbers.
       Carrillo said she was "80 percent sure" of her identifications of
26     each defendant.

27     On cross-examination, Carrillo said she remembered the short
       robber's height because he was a couple inches shorter than she
28     was.  When Carrillo and Langston stood together in the courtroom,

                                    3

however, Carrillo conceded that Langston was about an inch taller than she was.

Catherine Bloxham testified that she worked in an office in the same building as Gold Buyers.  Carrillo came to Bloxham's office and called the police after the robbery.  Bloxham recalled seeing two men enter Gold Buyers shortly before.  She saw them from about 15 feet away through the glass front of her office.  A few minutes later, she saw them leave.  She had seen the same men at the door of Gold Buyers about three days earlier.  On November 8, 2011, a detective showed Bloxham a photo lineup including Lawton and another including Langston.  Bloxham selected Lawton but identified no one in the lineup including Langston.  Bloxham testified that the photo she selected looked most like one of the men she saw, but she was not certain.  When asked if she could identify the defendants at trial, she said she "couldn't make a positive identification."  Like Lawton and Langston, the robbers were a taller, huskier man and a shorter, more slender one, and their skin tones were similar to those of the robbers.  Bloxham could not testify to any additional similarities.

**Advance America Cash Advance, Delano, October 11, 2011**

Adriana Gutierrez, 20 years old, testified that she was the only employee working at Advance America Cash Advance at 1019 Main Street in Delano on October 11, 2011.  Advance America Cash Advance was a business that made payday loans to customers.  At 3:10 p.m., two African-American men entered.  She estimated one was between five feet eight inches and six feet one inch tall and weighed about 230 pounds.  He wore a hat, a white shirt, and a black tie.  The other man was about five feet five or six inches tall and weighed about 120 pounds.  He wore a hat, a turquoise striped shirt, and black pants.  A surveillance video and still photos from the video were shown to the jury.  These show the robbers' clothing, size, and body types but do not include clear images of their faces.  The short robber's shirt was a plaid in black, white, and turquoise.

When the two men entered, the short one approached the counter as the tall one walked to the back of the store.  The short robber then leaped over the counter, knocked Gutierrez to the floor, and put a gun to her head.  He held her down on the ground, demanded to know where the money was, ordered her to open the cash drawer, called her "bitch" repeatedly, and threatened to kill her.  The tall robber ordered her to direct him to the safe, which was unlocked.  Then, still pointing the gun at her, the short robber ordered Gutierrez to lock herself in the bathroom.  About $2,000 was stolen.

Gutierrez and Detective Heriberto Trigo testified about photo lineups Trigo showed to Gutierrez.  On October 12, 2011, the day after the robbery, Trigo showed Gutierrez a lineup that did not include defendants.  She did not select any of the pictures.  On November 10, 2011, Trigo showed Gutierrez two more lineups, with Langston in one and Lawton in the other.  Gutierrez identified Lawton and, after first marking a different photo, also identified

Langston.  Gutierrez testified that she recognized the picture of Langston partly because his left eye was slightly lower than his right.

On January 10, 2012, the day of the preliminary hearing, Gutierrez came to the courthouse under subpoena and was asked to sit in the courtroom and observe about 10 inmates who were present there. Lawton and Langston were among them.  Gutierrez recognized them as the robbers.  She also identified defendants as the robbers in the courtroom at trial, saying yes when asked whether she could do so "with certainty."

**Gold Rush Jewelers, Bakersfield, October 22, 2011**

Michelle Castellanos, who was 25, testified that she was at work at Gold Rush Jewelers at the corner of Brundage and H Streets in Bakersfield around 4:00 p.m. on October 22, 2011.  Also present in the store were Castellanos's 14-year-old sister J. and Christopher, a teenager who had been hired to stand on the street corner holding a sign advertising the business.  The business bought and sold jewelry, musical instruments, and other items.

An African-American man entered the store and approached the counter.  He was about six feet tall, with a medium build, in his late 20's or early 30's, and wearing baggy clothes, a baseball cap, and sunglasses.  He had some earrings in one hand and some cash in the other.  He gave the earrings to Castellanos as if intending to sell them.  As she took the earrings, a second African-American man entered the store.  He was about five feet five inches tall, thin, no older than 20, and also wearing baggy clothes, a baseball cap, and sunglasses.  Before Castellanos could get started inspecting the earrings, she saw Christopher, who had been standing close to the short man, go down on all fours.  Then she saw that the short man had a black semiautomatic pistol in one hand.  He put the other hand on the counter and leaped over.  Once over the counter, the short robber approached J., grabbed her by her hair, and put the gun to her head.  Castellanos immediately ran to the silent alarm lever and pulled it.  The lever sent a signal to an alarm company.  The taller robber said "let's go," and the short one jumped back over the counter.  The two men ran out the door and then walked quickly away from the building.  Without pausing to reflect, Castellanos chased them out the door.  She ran halfway across the parking lot before turning back and going back inside to call the police.

On or after October 30, 2011, before Castellanos saw any photographic lineups, she saw a news story on the internet about the Max Muscle robbery discussed below.  The story included surveillance video and named defendants as suspects.  Castellanos thought the robbers in the video could be the same who robbed her. She searched Facebook for them by name and found Lawton's Facebook page.  The page included dozens of photos of Lawton. Castellanos was convinced he was the tall man who participated in the robbery of her store.  She contacted the police with this information.

5

On November 8, 2011, Detective Dossey showed Castellanos photo lineups that included Lawton and Langston. She selected a picture of Lawton and said he was the tall robber, but for the short robber she selected a picture that was not of Langston.

Castellanos came to court under subpoena on January 10, 2012, the day of the preliminary hearing. Sergeant Stratton asked her to look through the window in the courtroom door, observe the inmates inside, and say whether she saw the men who robbed her. The group of inmates in the courtroom that day consisted of four or five African-American men, six Hispanic men, and one white man. Castellanos identified Langston as the short robber. Lawton was not present. At trial, however, Castellanos testified that she recalled identifying both robbers at the preliminary hearing.

At trial, Castellanos identified Lawton and Langston as the robbers. She said she had no doubt.

Jacqueline Arnold entered the store just after the robbery attempt. Around 4:00 p.m. on the day of the attempted robbery, she drove up to a cigarette store in the same shopping center as Gold Rush Jewelers, planning to buy cigarettes. She testified that, before she could enter the cigarette store, she saw two African-American men come out, one about six feet tall and the other about five feet two inches tall. The short man was putting his hand under his shirt by his waistband. Arnold believed she had a good view of the short man, but not of the tall man. The short man had a distinctive nose. She watched them walk rapidly across the parking lot.

Sergeant Stratton showed photographic lineups to Arnold on November 14, 2011. She selected photos of Langston and Lawton. She felt very certain of her identification of Langston and less certain about Lawton.

Arnold came to the courthouse under subpoena on the day of the preliminary hearing and was asked by Stratton to look through the courtroom window at the inmates inside. This was the same group of inmates Castellanos had observed. Lawton was not present and Arnold identified Langston, but, like Castellanos, she testified at trial that she saw both robbers though the window that day. Arnold also identified defendants as the robbers at trial, but said she only "[s]ort of" recognized Lawton.

**Check into Cash, Visalia, October 26, 2011**

Barbara Martinez testified that she was working alone at Check into Cash at Noble Avenue and Chinowth Street in Visalia around 3:45 p.m. on October 26, 2011. Check into Cash makes payday loans to customers.

Two African-American men approached the front door and one pulled on the handle. Martinez buzzed them in. One man was thin and about five feet five or six inches tall. He was carrying a black messenger bag and wearing a dark blue T-shirt, dark jeans, and a dark blue or black baseball cap with white stitching on the front.

He looked young and had a "baby face."  The other man had a stocky build and was six feet five or six inches tall.  He wore a dark baseball cap and dark jeans with a brown and beige plaid button-down shirt with a dark shirt underneath.  Under the baseball cap, he was wearing a wig.  It was matted and frizzy and reached the middle of his back.

The tall robber asked Martinez about a payday loan.  As she answered, he walked around to her side of the counter and drew a silver semiautomatic pistol from his back pocket.  He told her not to press any buttons and then grabbed the front of her shirt, pulling it downward and exposing her bra.  He dragged her to a hallway at the back of the store and threw her to the floor, causing her head to strike it twice.  Next, he dragged her by the hair to a break room and again threw her down, repeatedly striking her head against the floor.  He stood over her and put the gun against the back of her head.  She heard a click.  During all this time, he was yelling at her, calling her bitch, and angrily demanding to know where the rest of the money was.  She said there was none.  He dragged her back to the front of the store and then to the rear again, becoming angrier and angrier as she continued to insist there was no more money.  Finally, he dragged her to the bathroom, threw her inside, and ordered her to remove all her clothes.  He closed the door.  The lights were off.  She took her clothes off, crying.  She thought he was going to rape and kill her.  Instead, he pulled a towel rack off the wall and hit her over the head with it.  He yelled some more, and then left.  She heard the robbers leaving the store through the back door, which led to an alley.  Then she hit a panic button in the bathroom and ran out and called 911.  The ordeal took about 30 minutes.  About $1,800 was taken from the cash registers.

On the day of the robbery, Martinez observed two men at in-field show-ups, but they were not the robbers.  On October 27, 2011, the day after the robbery, Detective Luma Fahoum showed Martinez two photo lineups that did not include defendants but did include other men Fahoum was investigating.  In one lineup, Martinez selected the photograph of the person of interest, saying she was not sure but thought he resembled the short robber.  In the other lineup, she said the person of interest looked more like the tall robber than any of the other people pictured, but was not him.  Over the next few days, Fahoum showed Martinez two more photo lineups, and a Detective Jennings showed her one.  From one of the lineups presented by Fahoum, Martinez set one picture aside, saying it looked more like the short robber than the others, but was not him.  From the final lineup presented by Fahoum, Martinez selected a photo of Lawton, saying she was 90 percent certain.  The lineup presented by Jennings included a photo of Langston, but Martinez did not select anyone from that lineup.

Martinez came to the courthouse under subpoena on the day of the preliminary hearing.  Fahoum asked her to look through the window in the courtroom door at the dozen inmates (including five African-American men) assembled inside and say whether either of the robbers was there.  Langston was among them, but not Lawton.  Martinez identified Langston as the short robber.  Martinez also

identified both defendants as the robbers at trial. She said she was certain about both.

**Max Muscle, Bakersfield, October 30, 2011**

Breon Mosley, 18 years old at the time of trial, was present at the commencement of the Max Muscle robbery and testified about the incident for the prosecution. Mosley's girlfriend, Sherri, lived near a Fastrip gas station on the corner of White Lane and Gosford Road in Bakersfield. Around midnight on October 30, 2011 (that is, the morning, not the evening, of October 30), Mosley called Jamiya Chandler and asked her to drive him to Sherri's house. Chandler arrived in a white van with Lawton and Langston. On the way to Sherri's house, they stopped at the Fastrip for snacks. A surveillance video from Fastrip showed the van arriving at 12:09 a.m. Mosley saw light coming from the open door of an adjacent business. According to Mosley's statement to police, Lawton and Langston looked at the open door, looked at each other, and smiled. The van pulled away from Fastrip at 12:16 a.m. It parked about a block away. Lawton and Langston got out, taking some dark sweaters, and walked away.

Mosley and Chandler drove back to Fastrip to get gas, arriving there at 12:21 a.m. Before leaving again at 12:24 a.m., Mosley heard three gunshots.

Mosley and Chandler drove on to Sherri's house. After 20 or 25 minutes, Lawton and Langston arrived, sweating and out of breath. Langston said someone had been shooting at them. Lawton said he had had to climb over a brick wall and some gates to get to the house. Mosley did not want to know what they had been doing and did not ask any questions.

Max Muscle was a store that sold vitamins, protein supplements for athletes, and similar products. It was located at 8000 McNair Lane, with its back door facing Fastrip at White Lane and Gosford Road. Jeff Revelle and Yvonne Carreno were the owners. Revelle and Carreno were boyfriend and girlfriend at the time of the robbery and husband and wife at the time of trial. They came to the store around 11:30 p.m. on the night of the robbery to collect money from the safe, drop off some supplements, and do some cleaning. They entered through the back door and left it ajar.

Carreno was cleaning the bathroom and Revelle was at the counter with two envelopes of money when two men entered the store. One man was African-American, about six feet two inches tall, about 30 years old, 240 to 250 pounds, and muscular. He was wearing a dark, puffy winter jacket and a purple baseball cap. He was chewing on a coffee-stirring straw. The other man also was African-American, five feet five or six inches tall, and about 150 pounds. He was wearing a hooded sweatshirt with the hood up. Both were holding semiautomatic handguns.

Carreno testified that the tall robber approached her from behind in the bathroom, told her not to move, and then left the bathroom. She

saw Revelle on his knees by the counter.  Then one of the robbers closed the bathroom door with Carreno inside.  She heard the robbers ordering Revelle to give them money.  Soon the bathroom door burst open and the short robber entered and pointed his gun at Carreno's face.  He was "very agitated" and "very hyper."  He ordered her to take her "fuckin' clothes off."  She pleaded with him, but he called her bitch and said he would "fuckin' kill" her if she did not comply.  When she stripped to her underwear, he told her to "take it all off" and again threatened to kill her.  He was pointing the gun at her face as these things happened and she feared he would rape her.

Revelle testified that he was at the counter when one of the robbers came from behind, put a gun to his head, and ordered him to go to the back of the store and get on the floor.  The short robber took the envelopes of money and demanded more.  Revelle said he thought there might be more money in his car.  The tall robber turned as if heading out to Revelle's car.  Revelle had a compact handgun in his pocket and now drew it and tried to fire at the tall robber.  The gun failed to fire the first two or three times Revelle pulled the trigger.  The tall robber said, "[H]e's got a gun."  The short robber emerged from the bathroom and both robbers fled from the store.  Meanwhile, Revelle had unjammed his gun.  He ran out after the robbers and fired five or six times.  The money taken totaled $6,000 to $7,500.

Sergeant Stratton showed a photo lineup to Carreno on November 1, 2011.  The lineup included Lawton.  Carreno ruled out the other five pictures, but was only 50 percent sure the remaining picture (Lawton's) was of one of the robbers.  She did not mark any of the photos.

Stratton also showed Revelle a lineup including Lawton on November 1, 2011.  Revelle did not mark any of the photos. He told Stratton he thought either Lawton or a second pictured man could be the tall robber.

Another officer showed Carreno another lineup on November 3, 2011.  This lineup included Langston.  Carreno selected a picture of a different person, however.  Revelle also was shown a lineup including Langston that day.  He selected a photo of someone else.

At Carreno's request, Stratton later showed her several additional still pictures of Lawton, the man about whom she was 50 percent certain.  After viewing these, Carreno was 80 percent sure Lawton was the tall robber.

After Lawton and Langston were arrested, Revelle and Carreno heard their names on the news and looked them up on Facebook.  They found Lawton's Facebook page and looked at photos of him there.  Both were sure he was the tall robber.

Carreno and Revelle came to court under subpoena on the day of the preliminary hearing.  Detective Dossey led Carreno and Revelle separately to the window in the courtroom door and asked them to

view the inmates inside.  Lawton, Langston, and another African-American man were there, along with several people in suits. Carreno and Revelle identified Lawton and Langston as the robbers.  At trial, they identified Lawton and Langston as the robbers again, both expressing complete certainty.

**People's gang expert**

Officer Holcombe testified as the prosecution's gang expert.  He opined that the West Side Crips were a criminal street gang within the meaning of section 186.22, one of several African-American gangs in Bakersfield.  He discussed the West Side Crips' territory, color, symbols, hand signs, tattoos, graffiti, monikers used by members, and rivals and allies among other local gangs.  He said the primary activities of the West Side Crips included drug sales, burglary, robbery, firearm possession, assaults with deadly weapons, and murder.  These activities raise money for the gang and enhance its reputation for violence and fearsomeness.  The gang had about 100 members as of the end of 2011.

Holcombe testified that the gang's members engaged in a pattern of criminal gang activity.  To establish this, he described six cases in which West Side Crips were convicted of a number of crimes, including a murder, an attempted murder, two robberies, a grand theft from a person, and a possession of marijuana for sale.  The grand theft from a person and the marijuana possession were committed by Lawton; he received sentences of four years and 16 months, respectively.

Holcombe opined that Lawton was a member of and an active participant in the West Side Crips.  This opinion was based on research on numerous pieces of information about Lawton, in addition to the two offenses just mentioned.  These included offense reports (police records of arrests), street checks (police records of consensual contacts), booking records, statements from other officers, and Lawton's Facebook page.

Lawton had a gang moniker . . . and on his Facebook page were pictures of him wearing clothing associated with the West Side Crips, including a Washington Nationals baseball hat, which was in the West Side Crips' color and had a W on the front.  Lawton had numerous tattoos, one of which had a gang association because it included words spelled with "cc" instead of "ck."

On four occasions when Lawton was being booked in to the Kern County Jail (two in 2002 and two in 2011), he affirmed an association with the West Side Crips and asked to be housed away from members of certain other gangs.  There were other bookings during which Lawton declined to claim a gang association.

Holcombe discussed 11 offense reports involving Lawton from 2000 to 2011.  In nine of these incidents, Lawton was arrested.  In each offense report, Lawton was described as admitting gang membership, being in the company of gang members, being in gang territory or at a gang hangout, or being arrested for a crime that is a

primary activity of gangs or related to a primary activity of gangs.
The offenses for which Lawton was arrested included auto theft,
possession of stolen property, possessing drugs for sale, forgery,
and being an active member of a criminal street gang.  Holcombe
also testified about seven street checks in which Lawton admitted to
membership in or association with the West Side Crips or was in
the company of other West Side Crips.  In an eighth street check,
Spellman said Lawton was his brother and was a West Side Crip.

Next, Holcombe discussed seven men with whom Lawton was
associated in the offense reports and street checks.  All were
members or associates of the West Side Crips.  Holcombe also went
through a series of text messages sent from Lawton's phone in
which Lawton communicated with other gang members; planned
crimes; negotiated drug deals; discussed gun purchases, bail
arrangements, and car rentals; and used gang monikers, terms, and
spellings.  Holcombe opined that gang members use rented,
borrowed, or stolen cars when committing crimes to hamper
detection.

Finally, Holcombe opined that a set of hypothetical crimes based on
the facts of the charged offenses would be committed for the benefit
of, at the direction of, or in association with the West Side Crips.
They would be for the benefit of the gang because the violence and
use of firearms would promote the reputation of the gang as a force
to be feared and would advance the individual members' status
within the gang; further, the money stolen would benefit the gang
by providing funds to underwrite future criminal activities (e.g., the
cost of rental cars, weapons, and drugs to be sold), bail and
commissary funds for incarcerated members, and the gang lifestyle.
The crimes would be in association with the gang because
Langston, Lawton, and other gang members and associates planned
and committed the crimes together and gained a variety of
advantages by doing so.  The crimes would be at the direction of
the gang because they involved an older member, Lawton, planning
the crime and directing a younger member, Langston, in its
execution.

**Defense Evidence**

The defense called J., the younger sister of Michelle Castellanos
and a witness to the Gold Rush Jewelers robbery.  She testified that
an officer showed her two photo lineups on November 8, 2011, one
including Langston and one including Lawton.  J. selected a filler
from each lineup.  On the day of the preliminary hearing, J. was
asked to look through the window in the courtroom door and say
whether she saw the robbers.  She identified someone inside as the
short robber.  At trial, J. identified defendants as the robbers.

11

*Langston*, No. F067421, 2016 Cal. App. Unpub. LEXIS 3712, at *2-66; ECF No. 30-6 at 2-43.

Furthermore, the Court of Appeal stated:

During a break in the trial, several jurors overheard comments made in the hallway by a troublemaking spectator named Donna Paniagua. After a hearing on this topic, the court excused one juror and allowed others who had heard the comments to continue serving.

Paniagua first came to the court's attention on December 18, 2012, after a bailiff removed her from the courtroom for making eye contact in a communicative way with Lawton or Langston. The court called Paniagua before it, warned her not to continue behaving in that way and allowed her to continue sitting in the audience. On January 2, 2013, Paniagua came to court with a pair of shoes for Langston, which she gave to Langston's counsel. Counsel gave the shoes to the bailiff, who searched them and found some tobacco or marijuana and matches concealed under the insole of each shoe. The jury was not aware of the contraband in the shoes.

On the same day, however, a group of jurors informed the bailiff they had heard Paniagua speaking loudly on the phone about people in prison and a "green light on" someone, among other things.

The court questioned the jury. Five jurors (Nos. 4, 5, 6, 9, and 10) and three alternates (Nos. 1, 3, and 4) said they heard Paniagua talking in the hallway. The court questioned these eight separately. Their accounts of what happened generally coincided on the following points: Paniagua was seated in an area where jurors usually congregated, even though on previous occasions she had tended to go off by herself to talk on the phone; she was speaking in a loud voice. She said someone named Angel was getting out of prison and there was a green light or a hit out on him. She said someone else—a cousin of the person she was speaking to—had gotten shot because he was a snitch. Paniagua seemed to have some connection to defendants as she had given shoes to one of the defense attorneys or had been making eye contact with one of the defendants.

After learning there had been some discussion of the matter among the jurors, the court also questioned the remaining jurors individually. Juror Nos. 1, 2, 3, and 12 heard nothing or heard Paniagua talking but made out none of the words. Juror No. 7 heard Paniagua refer to a snitch and a baby daddy. Juror No. 8 heard Paniagua use foul language and heard other jurors saying Paniagua had given signals to defendants and had referred to a green light and someone getting out of prison. Juror No. 11 heard fragments of Paniagua's comments and mainly remembered a reference to a baby daddy.

12

> Only juror No. 4 and juror No. 10 said they thought Paniagua was
> trying to be intimidating.  Only juror No. 10 could not be confident
> he would not hold what he heard against defendants when
> considering the gang issues in the case, since he understood
> Paniagua's terminology to be gang-related.  Because juror No. 10
> felt he was unable to continue without a bias based on Paniagua's
> statements, the court excused him over the People's objection.

> Except for juror No. 10, the court admonished all jurors and
> alternates not to consider Paniagua's conduct when making their
> findings in the case.  It obtained all jurors' and alternates'
> assurances that they would follow this instruction and remain
> impartial.

> Defendants moved for a mistrial on the ground that many jurors
> heard Paniagua's comments and this "infected the entire process"
> because the jurors would be unable to set aside what they heard
> when considering the gang issues.  Defendants also moved to
> excuse juror No. 4 because her testimony that she could be
> impartial was not credible.

> [Defendants argued that] Paniagua was trying to intimidate the jury,
> and other jurors testified that it was juror No. 4 who was most
> concerned about Paniagua's behavior.  The trial court denied both
> motions.

ECF No. 30-6 at 63-65.

Petitioner raised the same claims as those in the instant petition on direct appeal before the California Court of Appeal.  ECF No. 30-2, 30-5.  The California Court of Appeal rejected petitioner's claims and affirmed his conviction.  ECF No. 30-6.  Petitioner sought review of that decision before the California Supreme Court, which summarily denied review.  ECF No. 30-13.  Accordingly, petitioner has exhausted his claims before the state courts.[2]

## II.   Discussion

A federal court can grant habeas relief when a petitioner shows that his custody violates federal law.[3]  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

---

[2] Petitioner also unsuccessfully raised various unrelated claims in multiple habeas petitions before the Kern County Superior Court and the California Court of Appeal.  *See* ECF Nos. 30-8, 30-10, 33-20, 33-22, 33-23.

[3] This court has jurisdiction over the petition pursuant to 28 U.S.C. § 2241(a): "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."

1  (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

2  Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*,

3  562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the

4  last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v.*

5  *Sellers*, 138 S. Ct. 1188, 1192 (2018). In general, § 2254 requires deference to the state court

6  system that determined petitioner's conviction and sentence.

7        Under AEDPA, a petitioner can obtain relief on federal habeas claims that have been

8  "adjudicated on the merits in state court proceedings" only if he shows that the state court's

9  adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable

10  application of, clearly established Federal law, as determined by the Supreme Court of the United

11  States," or (2) "based on an unreasonable determination of the facts in light of the evidence

12  presented in the State court proceeding." 28 U.S.C. § 2254(d). The petitioner's burden is great.

13  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[To gain relief under § 2254(d)(1), a

14  petitioner] must show that the state court's ruling . . . was so lacking in justification that there was

15  an error well understood and comprehended in existing law beyond any possibility for fairminded

16  disagreement."); *see Davis v. Ayala*, 576 U.S. 257, 271 (2015) (quoting § 2254(e)(1)) ("[Under

17  § 2254(d)(2), s]tate-court factual findings . . . are presumed correct; the petitioner has the burden

18  of rebutting the presumption by 'clear and convincing evidence.'").

19        If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be."

20  *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the

21  State's significant interest in repose for concluded litigation, denies society the right to punish

22  some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises

23  of federal judicial authority." *Id*. at 103 (citation omitted). Our habeas review authority serves as

24  a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for

25  ordinary error correction through appeal." *Id*. at 102-103 (emphasis added).

26        Here, the Court of Appeal issued the last reasoned decision on petitioner's claims.

27  Because that court rejected his claims on the merits, the deferential standard of § 2254 applies.

28

1      **A.     Bifurcation of Gang Allegations**

2              Petitioner argues that the trial court erred when it failed to bifurcate the gang enhancement

3      proceedings from the remainder of trial; petitioner asserts that there was no connection between

4      the alleged crimes and gang membership.  ECF No. 9 at 20.  Specifically, petitioner contends that

5      he was charged with "ordinary robberies," that there was no evidence that the robberies were a

6      coordinated effort by two or more gang members using gang membership to accomplish the

7      robberies, and that the gang evidence was highly prejudicial and added little information relevant

8      to the charged offenses.  *Id*. at 21.  The Court of Appeal rejected these contentions, finding that,

9      under California law, the gang evidence presented was probative of petitioner's guilt and the

10     probative value of the evidence outweighed any prejudice.  ECF No. 30-6 at 48.  The Court of

11     Appeal accordingly found that the denial of petitioner's motion to bifurcate did not violate his

12     constitutional rights.  *Id*.

13             Petitioner ask us to find, at least in part, that the trial court violated California state law

14     when it failed to bifurcate the trial.  ECF No. 9 at 20-21.  Because we are bound on § 2254 habeas

15     review to accept a state court's interpretation of state law, we cannot grant relief based on this

16     aspect of petitioner's claim.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*,

17     502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-

18     court determinations on state-law questions.").

19             Petitioner also claims that non-bifurcation violated his federal constitutional rights.  ECF

20     No. 9 at 17.  The Supreme Court has noted that "[t]wo-part jury trials are rare in our

21     jurisprudence; they have never been compelled by this Court as a matter of constitutional law."

22     *Spencer v. Texas*, 385 U.S. 554, 568 (1967).  The Court of Appeals for the Ninth Circuit has

23     relied on *Spencer* to find that a claim arising from a state trial court's failure to bifurcate does not

24     implicate federal law.  *See Adams v. Jacquez*, 554 F. App'x 610, 611 (9th Cir. 2014); *see also*

25     *Langston*, No. 1:17-cv-01108-DAD-SAB, ECF No. 19 at 29 (finding that petitioner's co-

26     defendant Langston's similar bifurcation claim does not implicate federal law).  Therefore, the

27     California Court of Appeal's denial of petitioner's bifurcation claim cannot be contrary to, or an

28

1    unreasonable application of, clearly established federal law, and petitioner's claim should be

2    denied.

3    **B.    Identification Procedures**

4    Petitioner argues that he was denied his Sixth Amendment right to counsel when police

5    officers conducted an identification procedure outside the presence of his attorney, and that his

6    right to due process under the Fourteenth Amended was violated because the identification

7    procedures used were unduly suggestive.  ECF No. 9 at 24.

8    **1.    Right to Counsel**

9    The Court of Appeal rejected petitioner's Sixth Amendment right to counsel claim,

10   finding that petitioner had no right to counsel under the specific circumstances of the

11   identification procedure in question.  ECF No. 30-6 at 54.  Specifically, the Court of Appeal

12   reasoned that, under *United States v. Ash*, 413 U.S. 400, 314 (1973), "the Sixth Amendment right

13   to counsel attaches to trial-like confrontations between the accused and authorities.  It does not

14   apply to trial-preparation activities in which the defendant is not confronted."  *Id*.  On habeas

15   review, we ask whether the Court of Appeal's application of *Ash* was unreasonable.  *See Williams*

16   *v. Taylor*, 529 U.S. 362, 410 (2000).

17   A criminal defendant has the right, under the Sixth Amendment, to the presence of

18   counsel at all "critical" stages of criminal proceedings; this generally includes post-indictment

19   lineups.  *See United States v. Wade*, 388 U.S. 218, 224, 236-37 (1967).  However, the right to

20   counsel does not extend to all post-indictment identification procedures.  Rather, it is limited to

21   "trial-like confrontation[s], requiring the assistance of counsel to preserve the adversary process

22   by compensating for advantages of the prosecuting authorities."  *United States v. Ash*, 413 U.S.

23   400, 314 (1973).  Applying *Wade* and *Ash*, the Ninth Circuit has found that "the surreptitious

24   observation of a defendant in the courtroom by an identification witness is not an adversarial

25   confrontation requiring assistance of counsel."[4]  *United States v. Montgomery*, 150 F.3d 983, 993-

26   95 (9th Cir. 1998).

27   _____

28   [4] Although "clearly established federal law" under AEDPA refers only to holdings of the U.S.
     Supreme Court, Ninth Circuit precedent "may be relevant when [it] illuminates the application of

Here, petitioner was present in the courtroom before the preliminary hearing when police officers directed several witnesses to the crimes at issue to look through a window in the courtroom door.  ECF No. 30-6 at 52.  Officers asked the witnesses whether any of the defendants in the courtroom were involved in the crimes, and several witnesses identified petitioner.  *Id*.

As in *Montgomery*, petitioner was viewed without his knowledge—he was not subjected to an adversarial procedure, such as a direct confrontation by police officers or prosecutors. Although petitioner's counsel was not present during the procedure, petitioner has identified no "opportunities for prosecuting authorities to take advantage of" him.  *Montgomery*, 150 F.3d at 994.  Moreover, petitioner's counsel had the opportunity to cross-examine both the officers who conducted the identifications and the witnesses who identified petitioner during the procedure, providing an the opportunity to "reveal any improper procedures that occur[ed] in counsel's absence."  *Jordan v. Ducharme*, 983 F.2d 933, 937 (9th Cir. 1993); *see, e.g.*, ECF No. 31-14 at 17-22.  Considering all this, petitioner has not established that the California Court of Appeal's denial of his claim was contrary to, or an unreasonable application of, clearly established federal law.  Petitioner's claim should be denied.

## 2.   Identification Procedures

Petitioner argues that the identification procedures used by police officers—*i.e.*, the photo lineup and the courtroom viewing of petitioner before the preliminary hearing—were unduly suggestive, in violation of his right to due process under the Fourteenth Amendment.[5]  ECF No. 9 at 21-25.  The Court of Appeal rejected this claim, finding that petitioner failed to show that the

---

clearly established federal law as determined by the United States Supreme Court."  *Casey v. Moore*, 386 F.3d 896, 907, (9th Cir. 2004).

[5] Petitioner argues that the identification procedures used with Carrillo, Gutierrez, Castellanos, B. Martinez, Martinez, Revelle, Carreno, Guillen, and Diaz were unnecessarily suggestive.  ECF No. 9 at 24.  However, many of petitioner's arguments attack the reliability of the identifications, rather than the suggestibility of the procedures used—and are therefore of limited relevance to our analysis of suggestibility.  *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  Specifically, petitioner argues that the identifications were not reliable due to: the variance in the descriptions of robbers given by witnesses; the different locations, methods, and clothing of the robbers; the witnesses' focus on the gun held by the robber; and the mistaken identification of petitioner by two witnesses when he was not present in the courtroom.  ECF No. 9 at 24-25.

1   identification procedures were unduly suggestive and noting that some of his arguments rested on

2   "speculation."  ECF No. 30-6 at 58.

3        The Supreme Court has recognized that some identification procedures are "so

4   unnecessarily suggestive and conducive to irreparable mistaken identification" that they deny due

5   process of law.  *Stovall v. Denno*, 388 U.S. 293, 302 (1967).  However, identification testimony is

6   inadmissible as a violation of due process only if (1) "a pretrial encounter is so impermissibly

7   suggestive as to give rise to a very substantial likelihood of irreparable misidentification,"

8   *Simmons v. United States*, 390 U.S. 377, 384 (1968), and (2) "the identification is not sufficiently

9   reliable to outweigh the corrupting effects of the suggestive procedure," *Manson*, 432 U.S. at 114.

10  *See Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012); *Biggers*, 409 U.S. at 198; *Van Pilon*

11  *v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986).  Furthermore, "[i]f we find that a challenged

12  procedure is not impermissibly suggestive, our inquiry into the due process claim ends."  *United*

13  *States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985).  Whether due process was violated by an

14  identification procedure must be determined "on the totality of the circumstances," *Stovall*, 388

15  U.S. at 302, and "more than suggestion is required for a due process violation—the procedure

16  must create unnecessary or impermissible suggestion," *Baker v. Hocker*, 496 F.2d 615, 617 (9th

17  Cir. 1974).

18       The Court of Appeal found that the identification procedures were not unduly suggestive,

19  and accordingly declined to analyze whether the witnesses' identifications were reliable.  ECF

20  No. 30-6 at 59.  In response to petitioner's argument that the procedures were unduly suggestive

21  because some of the witnesses only identified petitioner during one of the procedures, the Court

22  of Appeal reasoned that "there is no rule that an identification procedure must have been

23  impermissibly suggestive if the witness failed to identify the suspect via a prior procedure."  *Id*.

24  The Court of Appeal rejected petitioner's argument that the display of additional pictures solely

25  of petitioner to one of the witnesses was suggestive because the witness had already tentatively

26  identified petitioner and had asked to see more pictures of him simply to confirm her

27  identification.  *Id*. at 58.  Moreover, the Court of Appeal found that any suggestiveness was

28  mitigated by the standard admonition given by the police prior to the identifications.  *Id*.

1        Petitioner has failed to show that the Court of Appeal's determination that the procedures

2    were not unduly suggestive was an unreasonable application of clearly established law.  Neither

3    the photo lineups nor the courtroom identifications featured petitioner alone and there is no

4    evidence to suggest that the officers focused the witnesses' attention specifically on petitioner.

5    *See Stovall*, 388 U.S. at 302 ("The practice of showing suspects singly to persons for the purpose

6    of identification, and not as part of a lineup, has been widely condemned."); *Bagley*, 772 F.2d at

7    493 (noting that an identification procedure is suggestive when it "emphasize[s] the focus upon a

8    single individual").  The fact that detectives instructed the witnesses to identify the robbers they

9    encountered does not render the procedures suggestive.  *See United States v. Bowman*, 215 F.3d

10   951, 966 (9th Cir. 2000) (italics in original) (explaining that a pretrial lineup is not impermissibly

11   suggestive merely because the witness knew the lineup included a suspect as "it stands to reason

12   that there *is* a suspect at the lineup stage").  The witnesses were given admonitions by the police

13   before viewing the photo lineups and viewing petitioner in the courtroom.  *See, e.g.*, ECF No. 31-

14   14 at 11-12; *see Oliva v. Hedgpeth*, 600 F. Supp. 2d 1067, 1080 (C.D. Cal. 2008) (noting that

15   standard pre-identification admonitions are "extremely important to avoid suggestiveness in the

16   presentation of a photographic lineup"); *Romero v. McEwen*, No. CV 11-5117-VBF (JPR), 2012

17   U.S. Dist. LEXIS 94018, at *20 (C.D. Cal. Jan. 17, 2012) (finding that pre-trial identification

18   procedures were not suggestive where witnesses received a standard admonition and believed that

19   they were not required to pick any particular person).  Here, for example, a police officer testified

20   that a witness was admonished to remember that a person's hairstyles, clothing, complexion, size,

21   and build can vary; that the persons in the courtroom "may or may not" have been involved in the

22   robbery; and that the witness was "under no obligation to select anyone if he did not believe that

23   those people were involved in the robbery."  ECF No. 31-14 at 11-12.

24        Moreover, during the courtroom identification, the police officers did not instruct

25   petitioner to "stand up or spin around" or "put on any costumes," and police officers and

26   witnesses had "no verbal or physical contact" with petitioner during the identification.  *Id*. at 14.

27   The officers did not exert their authority to compel petitioner to be present in the courtroom—

28   rather petitioner was present in the courtroom for the preliminary hearing.  *Id*.; *see Baker*, 496

F.2d at 617 (finding no due process violation where an identification was made at a preliminary hearing where the petitioner was seated at counsel table beside two men who had already been identified as involved in the relevant crime).  Petitioner's counsel had the opportunity to cross-examine the police and the witnesses.  *See Simmons v. United States*, 390 U.S. 377, 384 (1968) (explaining that the danger of identification procedures "may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error").  If the procedures had a "questionable feature," weighing its significance was appropriately left to the jury.  *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (noting that "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature").

Based on the foregoing, we find that the Court of Appeal's denial of petitioner's identification procedures claim was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, petitioner's claim should be denied.

### C.     Juror Bias

Petitioner argues that the trial court erred when it failed to excuse juror number four for bias.  ECF No. 9 at 27.  Petitioner states that the juror was influenced by "a woman affiliated with the petitioner," who made "threatening" statements within earshot of the jurors during the trial.  *Id*. at 29.  The Court of Appeal rejected petitioner's claim, concluding that the trial court had "weighed all the evidence" and that its finding that juror number four was credible and unbiased was reasonable.  ECF No. 30-6 at 70.

"The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors."  *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  However, it is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Rather, the right to due process is preserved where a criminal defendant is afforded  "a jury capable and willing to decide the case solely on the evidence before it" and "a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Id*.  When a court is "confronted with a colorable claim of juror bias," it "must undertake an investigation of the relevant facts and

1    circumstances" related to the alleged bias.  *Dyer*, 151 F.3d at 974; *see Smith v. Phillips*, 455 U.S.

2    209, 215 (1982) ("[T]he remedy for allegations of juror partiality is a hearing in which the

3    defendant has the opportunity to prove . . . bias.").  "[D]ue process requires only that all parties

4    be represented" at such a hearing and that the "investigation be reasonably calculated to resolve

5    the doubts raised about the juror's impartiality."  *Dyer*, 151 F.3d at 974.  "So long as the fact-

6    finding process is objective and reasonably explores the issues presented, the state trial judge's

7    findings based on that investigation are entitled to a presumption of correctness" on federal

8    habeas corpus review.  *Id*. at 975; *see Tinsley* v. *Borg,* 895 F.2d 520, 526 (9th Cir. 1990).

9    Petitioners must present clear and convincing evidence rebutting this presumption to gain relief.

10   *See* 28 U.S.C. § 2254(e)(1).

11        Here, a group of jurors informed the bailiff that they heard petitioner's associate speaking

12   loudly on the phone about someone being released from prison and having a "green light," or a

13   hit, on him.  ECF No. 30-6 at 64.  The associate also said that someone named Angel had been

14   shot because he was a "snitch."  *Id*.  The matter was brought to the attention of the trial court,

15   which promptly held a nearly one-day hearing in which both parties were represented by counsel

16   and all jurors and alternate jurors were questioned individually.  ECF No. 32-11 at 21.  Juror

17   number four testified that she believed that the associate's behavior was a "form of intimidation"

18   and "inappropriate."  *Langston*, No. 1:17-cv-01108-DAD-SAB, ECF No. 19 at 45.  However, she

19   also stated that the incident would "not have any influence over her" and that she would be "fair"

20   and "impartial."  *Id*. at 46.  The court, in denying petitioner's motion to excuse juror number four,

21   found that the juror "was truthful and forthright" and that she could be "completely fair and

22   impartial."[6]  *Id*.  The court also admonished all the jurors to remain impartial and make their

23   decision solely based on the evidence presented.[7]  *Id*.

24

25   _____

     [6] Notably, juror number 10 was excused because he "indicated to the court that he could no
26   longer be completely fair and impartial."  *Id*.

     [7] The trial court stated: "[R]emember it's your duty to decide this case based solely upon the
27   evidence properly admitted here in the courtroom.  And that includes things like sworn testimony
     of witnesses, evidence that's properly admitted.  It does not include things that happen out on the
28   street, in the hallway of the courthouse, even in the audience section of our courtroom."

1    Petitioner has failed to show that the Court of Appeal's rejection of his claim was contrary

2    to clearly established federal law. The trial court held a hearing that met the requirements of

3    *Smith*. Petitioner was represented by counsel and had the opportunity to show that juror number

4    four was biased. The hearing appears to have been a reasonable means of assessing possible bias.

5    Due process requires no more.

6    Moreover, petitioner has failed to show that the Court of Appeal's rejection of his claim

7    was based on an unreasonable determination of the facts. Petitioner has not presented evidence

8    that juror number four was either actually or impliedly biased against him. Actual bias "stems

9    from a pre-set disposition not to decide an issue impartially," whereas implied bias exists "in

10   exceptional circumstances where, for example, a prospective juror has a relationship to the crime

11   itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the

12   jury." *Fields v. Brown*, 503 F.3d 755, 766-67 (9th Cir. 2007) (en banc) (citing *McDonough*

13   *Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984)); *see Smith*, 455 U.S. at 222 ("[Examples

14   of implied bias include where a juror is] an actual employee of the prosecuting agency, . . . a close

15   relative of one of the participants in the trial or the criminal transaction, or . . . a witness or

16   somehow involved in the criminal transaction."); *Tinsley*, 895 F.2d at 527 (noting that bias may

17   be implied where the juror's relationship with the third party has a "potential for substantial

18   emotional involvement, adversely affecting impartiality").

19   Here, the contacts in question were not direct communications between the associate and

20   juror number four, but rather consisted of overheard phone conversations between the associate

21   and third parties discussing situations potentially unrelated to the case. Petitioner speculates,

22   without evidence, that these conversations led juror number four to fear petitioner and to ensure

23   that petitioner was incarcerated for the juror's own safety. However, juror number four testified

24   that these overheard conversations did not cause her to be biased, and the trial court found her

25   testimony credible. Petitioner has failed to rebut by clear and convincing evidence the

26   presumption of correctness afforded the trial court's finding of no bias. Petitioner's claim should

27   be denied.

28

1    **III.**     **Evidentiary Hearing**

2         Petitioner seeks an evidentiary hearing.  ECF No. 9 at 58.  There is no right to an

3 evidentiary hearing in habeas proceedings; only under limited circumstances are evidentiary

4 hearings granted.  *See* 28 U.S.C. § 2254(e)(2)(A)(ii).  A state prisoner seeking an evidentiary

5 hearing must show that he "was not at fault in failing to develop that evidence in state court, or (if

6 he was at fault) if the conditions prescribed by § 2254(e)(2) were met."  *Holland v. Jackson*, 542

7 U.S. 649, 652-53 (2004).  Under § 2254(e)(2), the petitioner must show either a new, retroactive

8 rule of constitutional law that was unavailable to him or a fact that he could not have discovered

9 through the exercise of due diligence.  28 U.S.C. § 2254(e)(2)(A)(ii).  Here, petitioner does not

10 argue that he was not at fault for failing to develop the evidence in state court.  Moreover, he

11 identifies neither a new, retroactive rule of constitutional law nor a fact that he could not have

12 discovered previously.  Therefore, petitioner has failed to meet AEDPA's requirements for an

13 evidentiary hearing, and we deny his request.

14    **IV.**     **Certificate of Appealability**

15         A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

16 court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

17 *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

18 district court to issue or deny a certificate of appealability when entering a final order adverse to a

19 petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

20 Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

21 showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

22 the petitioner to show that "jurists of reason could disagree with the district court's resolution of

23 his constitutional claims or that jurists could conclude the issues presented are adequate to

24 deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

25 *McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the

26

27

28

1   denial of a constitutional right.  Thus, we recommend that the court not issue a certificate of

2   appealability.

3   **V.      Findings and Recommendations**

4          The court should deny the petition for a writ of habeas corpus, ECF No. 9, and decline to

5   issue a certificate of appealability.  These findings and recommendations are submitted to the

6   U.S. District Court judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

7   the Local Rules of Practice for the United States District Court, Eastern District of California.

8   Within thirty days of the service of the findings and recommendations, petitioner may file written

9   objections to the findings and recommendations with the court and serve a copy on all parties.

10   That document must be captioned "Objections to Magistrate Judge's Findings and

11   Recommendations."  The district judge will then review the findings and recommendations under

12   28 U.S.C. § 636(b)(1)(C).

13   **VI.     Order**

14          Petitioner's motion for an evidentiary hearing is denied.  ECF No. 9 at 58.

15

16   IT IS SO ORDERED.

17

18   Dated:    __July 30, 2020__                              _____

                                                             UNITED STATES MAGISTRATE JUDGE

19

20   No. 206.

21

22

23

24

25

26

27

28